**SO ORDERED.**

**SIGNED this 03 day of September, 2010.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

PUBLISHED

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HP DISTRIBUTION, LLP., | ) | **Case No. 09-12310** |
| | ) | **Chapter 11** |
| Debtor. | ) | **Joint Administration** |
| _____ ) | | |
| IN RE: | ) | |
| | ) | |
| HITCHIN POST STEAK CO., | ) | **Case No. 09-12308** |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| _____ ) | | |
| | ) | |
| HITCHIN POST STEAK CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **Adversary No. 09-5258** |
| | ) | |
| GENERAL ELECTRIC | ) | |
| CAPITAL CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |
| _____ ) | | |

1

## **MEMORANDUM OPINION**

These cross-motions for summary judgment seek the Court's determination whether certain truck lease agreements between Hitchin Post Steak Co. ("HPS") and General Electric Capital Corporation ("GECC") are true leases or disguised security agreements. These motions were argued to the Court on July 13, 2010.[1] At stake here is whether HPS must cure and assume these leases in order to retain its tractors and trailers under 11 U.S.C. § 365 or whether it can cram down its obligations to GECC to the current value of the tractors and trailers under 11 U.S.C. § 1129(b)(2).[2] After careful review of the motions, memoranda, and arguments of the parties, the Court is prepared to rule.[3]

Summary Judgment Standards[4]

The primary purpose of granting a summary judgment motion is to avoid an unnecessary trial when there is no genuine issue of material fact in dispute. If there are no material facts in dispute, the sole issue for the court is whether the moving party is entitled to judgment as a matter of law.[5]

---

[1] HPS appeared by its attorney Mark Lazzo of Wichita, Kansas. GECC appeared by its attorney Alexander Terras of Reed Smith, LLP, Chicago, Illinois.

[2] Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11 U.S.C., as amended by BAPCPA (The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005).

[3] This is a core proceeding under 28 U.S.C. § 157(b)(O) and venue lies in the District of Kansas.

[4] The summary judgment rule, Fed. R. Civ. P. 56, is made applicable to adversary proceedings by Fed. R. Bankr. P. 7056.

[5] *See E.E.O.C. v. Lady Baltimore Foods, Inc.,* 463 F. Supp. 406, 407 (D. Kan. 1986) (Even if there are no genuine issues of material fact, the movant still has the burden to show that those facts entitle movant to judgment as a matter of law.); *Reed v. Bennett,* 312 F.3d 1190, 1195 (10th Cir. 2002).

2

Cross-motions for summary judgment do not require the Court to decide the case on the motions; if neither moving party has met its burden of establishing that there are no genuine issues of material fact and that, as a matter of law, it is entitled to judgment, the Court can deny both motions.[6]   The interpretation of the Agreements at issue here are particularly well-suited for resolution by summary judgment, where neither party asserts that the Agreements are ambiguous.[7]   As the party seeking to characterize the lease Agreements as something "other than what they purport to be," HPS bears the ultimate burden of persuasion at trial and the summary judgment stage.[8]

Each motion included an extensive statement of uncontroverted facts.  With one exception, the only statements of fact controverted by either HPS or GECC related to the characterization given by the parties of the transactions as either "purchases" or "leases."  Their legal character is the ultimate legal issue in this case.[9]   There is no controversy as to the execution, delivery and content

_____

[6]  *Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir. 2000) (Mere fact that cross motions are filed does not establish the absence of a material issue of fact; cross motions for summary judgment are to be treated separately.).  An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim. *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998).

[7]  *In re Aramark Leisure Services,* 523 F.3d 1169 (10th Cir. 2008) (The interpretation of an unambiguous contract is a question of law to be determined by the court and may be decided on summary judgment.); *In re JII Liquidating, Inc.,* 341 B.R. 256, 264-65 (Bankr. N.D. Ill. 2006).

[8]  *See WorldCom, Inc. v. Gen. Elec. Global Asset Mgmt. Serv. (In re WorldCom, Inc.),* 339 B.R. 56, 62 (Bankr. S.D. N.Y. 2006) (chapter 11 debtor, as party seeking to characterize purported lease agreement as disguised security arrangement, bore burden of proof at trial); *In re Brankle Brokerage & Leasing, Inc.,* 394 B.R. 906, 909 (Bankr. N.D. Ind. 2008) (truck-tractor TRAC lease*); In re Gateway Ethanol, L.L.C.,* 415 B.R. 486, 498 (Bankr. D. Kan. 2009); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L.Ed. 2d 265 (1986).

[9]  The characterization of a transaction is a question of law for the Court.  Conclusory characterizations without any concrete facts to support the characterizations are afforded no

3

of the transaction documents. The only other controverted fact is GECC's assertion that, based upon a summary appraisal (filed after the argument), the useful life of all of the property exceeds eight years.[10] HPS's controverting statement contains no supporting citation to the record.[11] At oral argument, counsel for both sides agreed that the property had a useful life in excess of the terms of the transactions.[12] Whether the Court may consider the appraisal is considered below.

Uncontroverted Facts

The facts controlling this adversary proceeding may be summarized as follows.

HPS filed this case on July 21, 2009. Beginning in 2006, HPS executed a series of agreements titled "Truck Lease Agreement (TRAC)" (the "Agreements") whereby GECC purported to lease to HPS a line of tractors and refrigerated trailers for use in HPS meat delivery business. The agreements are substantially similar in format and effect, except as set out below.

The First Agreement is dated June 30, 2006 and describes a 60-month lease of five sets of new refrigerated trailers and refrigerator units (referred to herein as "reefers" and "reefer units" respectively). The Second Agreement is dated September 1, 2006 and describes a 60-month lease of ten new tractors. The Third Agreement is dated October 27, 2006 and describes a 60-month lease of one new tractor. The Fourth Agreement is dated May 4, 2007 and describes a 60-month lease of

---

weight by the Court. *See Murray v. City of Sapulpa,* 45 F.3d 1417 (10th Cir. 1995); *Patton v. AFG Industries, Inc.,* 92 F. Supp. 2d 1200, 1202 n. 3 (D. Kan. 2000); *Stephens v. City of Topeka, Kan.,* 33 F. Supp. 2d 947, 959 (D. Kan. 1999); *Rogers v. United States,* 58 F. Supp. 2d 1235 (D. Kan. 1999).

[10] Dkt. 17, ¶ 68.

[11] Dkt. 27, p. 4 ¶ 68.

[12] At oral argument, counsel for HPS conceded that the useful life was not disputed but noted that this was not a material issue.

4

two new reefers and reefer units. The Fifth Agreement is dated October 27, 2006 and describes a 60-month lease of five new reefers (and no reefer units). The Sixth Agreement is dated May 20, 2007 and describes a 60-month lease of three new reefers and reefer units. The Seventh Agreement is dated May 1, 2008 and describes a 48-month lease of six used reefers and six used reefer units. Five of the six used units were model year 2006, thus at least two years old at the time of the agreement. The sixth unit was a model year 2007, thus at least one year old at the time.[13]

GECC's assertion that the useful life of these tractors, trailers and reefer units exceeds eight years is supported by a summary appraisal that was referenced as an exhibit to its summary judgment memorandum, but not attached.[14] HPS' rebuttal of this assertion is merely a general denial that lacks any documentary support.[15] At argument, however, both counsel agreed that this equipment had a useful life in excess of the terms of the Agreements. After argument, the Court noted the absence of the appraisal exhibit and the clerk advised the parties accordingly. GECC filed this exhibit on July 21, 2010.[16] The exhibit consists of the appraisal report under cover of a letter dated February 16, 2010, from GECC's counsel to debtor's counsel stating that the attached appraisal report is "our designation of expert and his report." The appraisal report is not referenced in GECC's supporting affidavit submitted with its summary judgment papers as required by Fed.

---

[13] There was no information in the papers concerning the "in-service" date of the used equipment.

[14] Dkt. 17, p. 12, ¶ 68.

[15] Dkt. 27, p. 4, ¶ 68.

[16] Dkt 51.

5

R. Civ P. 56(e)(1) and this District's local rule.[17]  Rule 56(c)(2) provides that summary judgment

may be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits"

show the absence of a factual controversy and that the movant is entitled to judgment as a matter of

law.  The Court concludes that the appraisal report is part of the "disclosure materials on file" and

finds that it may be relied upon by GECC in support of its motion.  This finding is buttressed by the

parties' stipulation that these tractors, trailers and reefer units have a useful life in excess of 60

months and HPS's failure to properly controvert GECC's paragraph 68 statement.[18]  The Court finds

that the useful life of the goods in question was equal to or exceeded 8 years at the times the

Agreements were executed.

    While six of the seven Agreements are virtually identical, the First Agreement is different.

The Second through Seventh Agreements consist of the following components.  The seminal

document is the "Truck Lease Agreement (TRAC)."   Attached to this agreement are "Schedule A

Even Payments (TRAC)" and "Schedule B Final Adjustment Table."  The Agreement sets out the

relationship and duties of the parties while Schedule A contains what the parties agreed was the

value of the equipment at the inception date, the monthly rent, and the residual value at the end of

---

[17]  *See* D. Kan. LBR 7056(d); *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992) (noting that sufficient evidence pertaining to a material issue must be identified by reference to affidavit, deposition transcript or specific exhibit incorporated therein), cert. denied, 506 U.S. 1013 (1992); *Harris v. Beneficial Oklahoma, Inc. (In re Harris)*, 209 B.R. 990, 996 (10th Cir. BAP 1997) (A document must be  identified or authenticated by affidavit or sworn testimony.).

[18]  *See* Fed. R. Civ. P. 56(e)(2).  Just as the summary judgment movant has a duty to support its factual contention with a citation to the record, the non-movant has a like duty in responding to the movant's statements of uncontroverted fact.  The non-movant cannot rely upon mere denial of the statement as HPS did here.  *See* D. Kan. LBR 7056(a) and (b).  The consequence of failing to properly controvert the movant's statement is that the statement of fact is deemed admitted. *See* D. Kan. LBR 7056(a).

the term. Schedule B contains the "final adjustment," the percentage by which the initial agreed value of the equipment is multiplied to determine the extent to which the parties are indebted to each other upon early termination of the lease.

The First Agreement is different in that it includes Schedule A, but does not include Schedule B. Instead, the parties signed an "Amendment to Truck Lease Agreement (TRAC)" (the "Amendment") that modifies paragraph 9 of the form Agreement to reference a different formula for determining the terminal adjustment, one that relies on the calculation of the net present value of the agreed residual value.

All of the Agreements specify that Texas law will apply.[19] The Court observes that Kansas has also adopted the same UCC provisions at issue here.[20] As a practical matter, the Court can consider decisions from other jurisdictions that interpret these uniform provisions without affecting the outcome.[21]

There is no dispute that all of these agreements and supporting documents were properly executed by authorized representatives of the parties and that they are enforceable. The only remaining question here is a legal one, whether these Agreements should be enforced as leases to

---

[19] It is well established that the determination of whether an agreement that appears to be a lease on its face is in fact a lease or a security agreement is made by reference to state law. *See In re Gateway Ethanol, L.L.C.,* 415 B.R. 486, 498 (Bankr. D. Kan. 2009); *In re Charles,* 278 B.R. 216, 219-20 (Bankr. D. Kan. 2002); *Butner v. United States,* 440 U.S. 48, 54-55, 99 S. Ct. 914, 59 L.Ed. 2d 136 (1979).

[20] KAN. STAT. ANN. § 84-1-203 (2009 Supp.) (Lease distinguished from security interest); § 84-1-201(b)(35) (2009 Supp.) ("security interest" defined). Both of these statutory provisions derive from the 1987 version of UCC § 1-201(37).

[21] *See In re Grubbs Const. Co.,* 319 B.R. 698, 712 (Bankr. M.D. Fla. 2005).

7

be assumed or rejected under § 365 or allowed as secured claims to be crammed down to the equipment's value under §§ 506(a) and 1129(b)(2).

Analysis

These motions require the Court to apply § 1-203 of the Uniform Commercial Code (UCC) to determine the legal status of the Agreements as leases or security agreements. Texas has adopted the UCC, but there are numerous cases that interpret this uniform section and its predecessor, the 1987 version of § 1-201(37).[22] Before analyzing these Agreements by applying the statute, it is important to note as have UCC treatise authors, James White and Robert Summers, that a true lease in its purest form has two distinguishing attributes: the lessor retains an "entrepreneurial stake" in the leased property and keeps a valuable "reversionary" interest:

> The central feature of a true lease is the reservation of an economically meaningful interest to the lessor at the end of the lease term. Ordinarily, this means two things: (1) at the outset of the lease the parties expect the goods to retain some significant residual value at the end of the lease term; and (2) the lessor retains some entrepreneurial stake (either the possibility of gain or the risk of loss) in the value of the goods at the end of the term.[23]

---

[22] Texas adopted the UCC in 1965 and it became effective July 1, 1966. Texas has also adopted the 2001 Revision of Article 1. *See* Tex. Bus. & Com. Code Ann., Title 1, Refs & Annos and § 1.101 (West 2009). The entire UCC as adopted in Texas can be found at Tex. Bus. & Com. Code Ann. §§ 1.101 - 11.108 (West 2009). Due to deletion and renumbering of the definitional statute, the definition of "security interest" in former § 1-201(37) of the UCC is found at § 1.201(b)(35) of the Tex. Bus. & Com. Code Ann. *See* Tex. Bus. & Com. Code Ann. § 1.201, UCC Comment (West 2009). Section 1.203 became effective September 1, 2003 with an extensive amendment of Chapter 1 [UCC Article 1]. *See* Tex. Bus. & Com. Code Ann., Title 1, Ch. 1, Refs and Annos (West 2009). *See also,* U.C.C. § 1-201(b)(35) and § 1-203 (2001), Official Comments, 1 U.L.A. 16, 20, 23, 26 (West 2004) (discussing the 2001 revision to Article 1).

[23] J. White and R. Summers, Uniform Commercial Code Vol 4 § 30-3 at p. 2 (2009), citing Huddleson, Old Wine in New Bottles: UCC Article 2A Leases, 39 Ala. L. Rev. 615, 625 (1988).

8

On the other hand, a security interest involves a lender who lends money to a purchaser to acquire property.[24] The borrower grants a lien on the purchased goods to secure the loan's repayment. The lender has an interest in the collateral's value not declining below the loan balance, but that is the extent of the lender's entrepreneurial interest in the property. Instead, it is the owner who retains the stake. The Agreements before the Court today fall somewhere between these two extremes. The Court applies § 1-203's provisions as "signposts" to determine whether these Agreements are true leases as a matter of law.

Section 1-203(a) begins by stating that whether a particular transaction is a lease or a security interest is determined by each case's facts.[25] Subsection (b)'s preface sets out the first signpost–

> A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee . . . .[26]

If the transaction is subject to being terminated by the lessee, that points toward it being a lease rather than a security interest. The second signpost is found in the four conditions enumerated in subsection (b).[27] If one of these is found in the transaction, and if the transaction cannot be terminated by the lessee, the transaction is more likely a security interest. As these Agreements are not renewable and there is no purchase option for the lessee upon termination, § 1-203(b)(1) is the most relevant condition in this case. Is the original term of the lease equal to or greater than the

---

[24] *Id.*

[25] TEX. BUS. & COM. CODE ANN. § 1.203(a) (West 2009).

[26] TEX. BUS. & COM. CODE ANN. § 1.203(b) (West 2009).

[27] *Id.*

9

remaining economic life of the goods?  If it is, a security interest may be found to exist as the lessee

will have essentially retained the goods as long as or even after their usable life is exhausted, leaving

the lessor with no remaining value or use upon expiration of the agreement.

Subsection (c) of § 1-203 sets out a list of six conditions that are not sufficient by themselves

to render a transaction a security interest.  They are:

> A transaction in the form of a lease does not create a security interest merely
> because:
> (1) the present value of the consideration the lessee is obligated to pay the lessor for
> the right to possession and use of the goods is substantially equal to or is greater than
> the fair market value of the goods at the time the lease is entered into;
> (2) the lessee assumes risk of loss of the goods;
> (3) the lessee agrees to pay, with respect to the goods, taxes, insurance, filing,
> recording, or registration fees, or service or maintenance costs;
> (4) the lessee has an option to renew the lease or to become the owner of the goods;
> (5) the lessee has an option to renew the lease for a fixed rent that is equal to or
> greater than the reasonably predictable fair market rent for the use of the goods for
> the term of the renewal at the time the option is to be performed; or
> (6) the lessee has an option to become the owner of the goods for a fixed price that
> is equal to or greater than the reasonably predictable fair market value of the goods
> at the time the option is to be performed.[28]

White and Summers suggest that "by these six conditions the drafters sought to overrule a series of

bad decisions under the pre-1987 version of section 1-201(37)."[29]  In short, these factors cannot, by

themselves, render a transaction in lease format a security interest per se as some cases under the

pre-1987 law found.

Subsection (e) of § 1-203 provides that the "remaining economic life of the goods" is to be

---

[28]  U.C.C. § 1-203(c) (2001), 1 U.L.A. 26 (West 2004); TEX. BUS. & COM. CODE ANN. §
1.203(c) (West 2009).

[29]  J. White and R. Summers, UNIFORM COMMERCIAL CODE Vol 4 § 30-3 at p. 7 (2009)

10

determined with reference to the facts and circumstances at the time the transaction is entered into.[30] As White and Summers say, "[f]oresight not hindsight controls."[31]

Finally, having determined whether the Agreements are terminable and whether one of the four subsection (b) conditions exist, the Court must consider the economic realities to determine the fundamental question: whether the lessor retains a "meaningful reversionary interest" in the property. It is this determination that focuses the Court directly on the "terminal rent adjustment clause" (TRAC) that has been the subject of many cases.

A supplemental consideration here is the fact that many states (including Texas and Kansas) have enacted so-called TRAC-neutral statutes that provide, in essence, that the presence of a TRAC clause does not render a transaction a security interest per se.[32] Texas' statute provides:

> Notwithstanding any other law, an agreement for the lease of a motor vehicle does not create a sale or security interest by merely providing that the rental price is permitted or required to be adjusted under the agreement as determined by the amount realized on the sale or other disposition of the vehicle.[33]

The Court views this legislation as adding a seventh condition to § 1-203(c). With this analytical framework in mind, the Court turns to the Agreements themselves.

<u>The Agreements</u>

As noted above, the First Agreement contains a different TRAC clause than do the other six. Other than that distinction, all of the Agreements share the same characteristics and terms. Each

---

[30] *See also* TEX. BUS. & COM. CODE ANN. § 1.203(e) (West 2009).

[31] J. White and R. Summers, UNIFORM COMMERCIAL CODE Vol 4 § 30-3 at p. 8 (2009)

[32] *See* TEX. TRANSP. CODE ANN. § 501.112 (West 2009); KAN. STAT. ANN. § 84-2a-110(a) (2009 Supp.), enacted in 1998.

[33] TEX. TRANSP. CODE ANN. § 501.112 (West 2009).

11

provides at paragraph 3 that the lessee may terminate the lease as to any equipment on any anniversary of the delivery date of the equipment by (1) giving notice to the lessor of its intent to terminate; (2) returning the property to the lessor; and (3) paying the lessor any amounts owed under paragraph 9 of the lease, the "final adjustment clause." If the lessor consents, the lessee may terminate the lease on a date other than an anniversary date by paying a fee of the greater of $500 per vehicle or 2 per cent of the agreed value of the vehicle on Schedule A as a termination fee, if the termination occurs within the first twelve months of the Agreement's term. If the termination occurs after the first twelve months has elapsed, the lessee need only pay the greater of $500 or 1 per cent of the agreed value. These termination fees are paid in addition to the "final adjustment." HPS alleges that this early termination clause is so onerous as to render it nugatory. GECC responds that the cost of termination is sufficiently small to make lessee's right to terminate substantial and therefore these Agreements lie outside the conditions of § 1-203(b).

To address these arguments, the Court must also review and understand the operation of paragraph 9, the "final adjustment" paragraph. Paragraph 8 provides that upon termination or expiration of the Agreement's term, the lessee is to return the property to the lessor after which the lessor shall "cause the vehicle to be sold at public or private sale, at wholesale, for the highest cash offer received and still open at the time of sale." The "net proceeds of sale" include the sale proceeds less any clean-up and other direct costs of sale. Paragraph 9 provides that, on final adjustment, the lessor shall pay the lessee any amount by which "the sum of (a) the net sale proceeds, and (b) surplus insurance recoveries, if any . . . , exceeds (c) a Final Adjustment Amount . . . " calculated as of the payment date immediately before the return of the property to the lessor. The "final adjustment amount" is defined as the product of the Schedule A agreed value of the

vehicle multiplied by the "final adjustment percentage" on the respective calculation date as found on the Final Adjustment Table on Schedule B. If the sum of the net sale proceeds and insurance recoveries does not exceed the final adjustment amount, the lessee is required to pay the difference to the lessor.

Applying this formula to the hypothetical return of one of the 2007 International Harvester 9400 Tractors covered by the Second Agreement, the Court assumed HPS cancelled the lease and returned it in the 12th month of the lease term. The agreed value of the tractor on Schedule A is $98,362.80. The Final Adjustment Percentage on Schedule B is 92.144 percent. Multiplying the agreed value by the Final Adjustment Percentage yields $90,635.42. If the wholesale liquidation of the tractor yielded more than that amount, GECC would owe the surplus to HPS. If it yielded less than that amount, HPS would owe the shortfall to GECC. Absent a record, the Court cannot speculate about what the sale of the tractor might have yielded 11 months after the inception of the Agreement in September of 2006, but it can observe that the difference between what the sale of a one year-old tractor might bring and $90,635 is not likely to be enough to deter a lessee from terminating early. The Court distinguishes this hypothetical from the onerous requirement that a lessee pay a significant portion of the remaining unpaid lease payments as the lessee was required to do in *In re Chance Industries, Inc.,* an unpublished opinion of this Court.[34] There a debtor's early termination of a purported lease of computer equipment would have resulted in debtor being

---

[34] *Chance Industries, Inc. v. TCF Leasing, Inc. (In re Chance Industries, Inc.)*, 2002 WL 32653678 (Bankr. D. Kan. Mar. 29, 2002).

required to pay over fifty per cent of the equipment cost, *plus* twelve months' rental.[35]  The Court

concludes that the termination clauses in the Agreements before it today are meaningful and that the

Agreements are subject to termination by lessee HPS within the meaning of the preamble to § 1-

203(b).

The First Agreement's final adjustment feature is different, but its effect is the same.

Appended to the First Agreement is an amendment that replaces paragraph 9 with a substitute that

changes the methodology for determining the final adjustment.  As noted above, there is no

"Schedule B" that details a final adjustment percentage.  Instead, the First Agreement's final

adjustment process begins with the net proceeds of the post-termination or lease expiration sale of

the goods plus any insurance recoveries.  From the net proceeds is subtracted the sum of any <u>accrued</u>

but unpaid rents plus the "termination value."  The termination value is defined as "an amount equal

to the then present worth of all unaccrued monthly rentals plus the then present worth of the

Residual Value. . . ."  This is calculated by discounting the unaccrued rentals from their due dates

and discounting the residual value from the first date that rent is due under the Agreement using

monthly compounding intervals and the rate specified on Schedule A, 7.90 per cent.  Summarizing,

if the net sales proceeds are greater than any accrued but unpaid rents plus the discounted value of

the future rents and the discounted value of the residual value, then HPS receives the surplus.  If the

net sales proceeds are less, HPS pays GECC the shortfall.

The Court attempted to replicate these calculations for a hypothetical termination of one of

the First Agreement's trailers.  Consider a termination of the lease of the trailer acquired for $50,650

---

[35] *Id.* at *5.  In addition, the right to terminate was a limited one.  The lessee was only
permitted to terminate in the twelfth month.

Case 09-05258    Doc# 58    Filed 09/03/10    Page 14 of 28

and rented at $868 per month. The agreed residual value is $10,130 and the Schedule A termination value rate is 7.9 per cent. If HPS terminated the lease of one such trailer in the twelfth month of the Agreement, the termination value would equal the present worth of the remaining 48 months of unaccrued rents, discounted at 7.9 per cent per annum, plus the present worth of the residual value of $10,130, discounted at a like percentage. The Court's calculations suggest that the present value of the 48 months' rents at 7.9 per cent is approximately $35,623 and that the discounted value of the $10,130 residual at the same rate is $7,393 for a total termination value of $43,016 or approximately 85 per cent of the initial value of the trailer. As with the other six Agreements, the Court believes that the right to terminate early is a substantial one that might be exercised by a debtor and is very different from the prohibitively expensive right to terminate that the Court addressed in *Chance Industries*.

Because HPS has a right of termination, the Agreements do not satisfy the first part of the "bright line" test of § 1-203(b) to mandate a finding that the Agreements create a security interest.[36] The Court next considers the four conditions comprising the second part of the bright line test of § 1-203(b), specifically subsection (b)(1) -- whether the original term of the lease is equal to or greater than the remaining economic life of the goods. Six of the seven Agreements had 60 month terms, and the seventh Agreement was to run 48 months. Counsel agreed that the useful life of these tractors and reefers exceeded the terms of the Agreements. The summary appraisal suggested that the tractors had a total useful life of 8 to 12 years and the trailers could last from 8 to 10 years. As

---

[36] *See Excel Auto and Truck Leasing, L.L.P. v. Alief Independent School Dist.,* 249 S.W. 3d 46 (Tex. App.-Houston 2007) (The agreement cannot be deemed a security interest if it is terminable by the lessee); *In re Grubbs Const. Co.,* 319 B.R. 698, 714 (Bankr. M.D. Fla. 2005) (If the conditions of the bright line test are met, the agreement is *per se* a security agreement.).

15

of February of 2010, the date of the appraisal, the tractors' and trailers' remaining useful lives ranged from 3 to 8.5 years. The Court can conclude that the Agreements' terms are less than or equal to the remaining economic life of the equipment they cover.

As noted before, none of the remaining three conditions found in § 1-203(b) applies here. Under paragraph 3, the term of each Agreement "shall extend for a period not in excess of the Maximum Term noted in the Schedule A relating to such Vehicle." Schedule A of the Agreements, reflect a set lease term of 60 months, except for the Seventh Agreement which reflects a lease term of 48 months. There is no right to renew or extend the maximum lease term of the Agreements beyond those terms. Therefore, HPS was not bound to renew the lease for the remaining economic life of the goods or to become their owner as stated in § 1-203(b)(2). Likewise, because the Agreements' terms are limited, there is no option for HPS "to renew the lease for the remaining economic life of the goods" as set out in § 1-203(b)(3). Nor is there an option for HPS to become the owner of these goods for no consideration or for nominal consideration as set out in § 1-203(b)(4).

Because the Agreements do not satisfy the bright line test of § 1-203(b), the Agreements do not create a security interest *per se*. This does not end the Court's inquiry however. The Court is required to consider the economic realties of the Agreements and the § 1-203(c) terms to determine whether the Agreements create a security interest.[37]

_____

[37] *Excel Auto and Truck Leasing, L.L.P., supra* at 51 ("If the bright-line test is not satisfied, the finding of a security interest is not mandated, and the court may examine additional facts, recognized by the statute, to determine whether the economic realities of a particular transaction create a security interest."); *In re Gateway Ethanol, L.L.C.,* 415 B.R. 486, 498 (Bankr. D. Kan. 2009) ("[C]ourts and commentators agree, that even if the bright line test is not satisfied, the courts must apply a second test, examination of the specific facts of the case to

The Agreements do contain several terms that are described in § 1-203(c)(1) through (c)(6), factors that should not, standing alone, mandate the finding that a lease is, in fact, a security agreement. There is no direct evidence suggesting that the present value of the lease rents is substantially equal to or greater than the fair market value of the goods, and the Court observes that each Agreement contemplates significant residual values being left at expiration.[38] HPS assumed certain risk of loss by virtue of the TRAC clause and paragraph 10 which provides that "loss or damage to each vehicle and loss of use thereof, from whatsoever cause, are risks assumed by Lessee . . . ."[39] HPS agreed to pay taxes, insurance and other costs as Additional Rents.[40] Thus the first three subsections of § 1-203(c) apply here, but the rest of the subsections do not. None of these conditions standing alone render these transactions security interests per se. As noted previously, the Texas TRAC-neutral statute provides that the presence of an adjustment clause does not mandate the finding of a security interest.

Having determined that these Agreements have no provisions that force a finding that they are security interests under subsection (b) and finding only three of the six "merely because" conditions listed in subsection (c), the Court turns to the economic realities of these Agreements. This requires us to look beyond the form of the Agreements and examine the nature and extent of

---

determine whether the economics of the transaction support such a result [security interest]."); *In re Grubbs Const. Co.,* 319 B.R. 698, 714 (Bankr. M.D. Fla. 2005); *WorldCom, Inc. v. Gen. Elec. Global Asset Mgmt. Serv. (In re WorldCom, Inc.),* 339 B.R. 56, 65 (Bankr. S.D. N.Y. 2006).

[38] *See* § 1-203(c)(1). With one exception, the 2007 utility trailer (unit number 043804) has a -0- residual value in the Seventh Agreement. This lone exception will be discussed below.

[39] *See* § 1-203(c)(2).

[40] *See* § 1-203(c)(3).

17

the reversionary interests GECC retained in the tractors and trailers. Did GECC retain a meaningful upside or downside in these goods?

In general, GECC and HPS agreed that all of the property would have some residual value, in most cases about 20 or more per cent of its initial value. This alone suggests that GECC retained some valuable interest in the property at expiration. The total residual value stated in the Agreements is $651,500. The total fair market value of the equipment as of February of 2010 was $973,250.[41] GECC's "stake" in the equipment at the end of the Agreements' term is substantial.

HPS argues that the final adjustment process essentially protects GECC from downside risk to its residual property interest by assuring that if the sale of the property brings less than the residual value, HPS is required to pay the difference. GECC's response to this proposition is that it is only protected to the extent that HPS is credit-worthy and that the terminal adjustment process merely shifts the risk of the equipment's overuse to the user, HPS, rather than the owner, GECC. Various commentators and courts have concluded that TRAC provisions merely operate to shift risk, not to transfer ownership from the lessor to the lessee. One such decision is *Sharer v. Creative Leasing, Inc.*, where the Alabama Supreme Court found as much.[42] In their treatise, John Minan and William Lawrence refer to the *Sharer* case as "a step in the right direction."[43] They comment that lessors know that some lessees will use goods harder than others and that a TRAC clause merely allows the lessor to adjust the total lease payment to reflect the value of the lessee's usage and more

---

[41] *See* Dkt. 51.

[42] 612 So. 2d 1191 (Ala. 1993)

[43] J. Minan and W. Lawrence, THE LAW OF PERSONAL PROPERTY LEASING, § 2:26, p. 2 (2010).

18

accurately compensate the lessor. "Most significantly, provided that the lease is not to the end of the useful life of the goods, the lessor has retained a meaningful residual interest in the goods. By its very nature, a TRAC lease provision shows that the lessor is concerned about the return of the goods at the end of the lease term and the protection of its residual interest."[44]

Two recent Kansas bankruptcy cases have considered the question of a "meaningful reversionary interest." Most recently, Judge Somers addressed it in *In re Gateway Ethanol, L.L.C.*, a case dealing with the lease of a boiler system to an ethanol plant operator.[45] After a careful analysis of case law under the pre-1987 version of § 1-201(37), the court applied the bright line test by applying the factors that appear in § 1-203(b) and determined that the purchase option's consideration was not nominal. Then the court focused on the "economic factors of the agreement" to evaluate whether the lessor retained a residual interest in the boiler. In particular, he considered:

> (1) The anticipated useful life of the TO/Boiler; (2) IPE's [lessor's] ability to market the TO/Boiler at the end of the lease term; (3) the amount of the lease payments in relation to the value of the TO/Boiler; (4) whether the TO/Boiler is unique because it was designed for installation in the Gateway plant; (5) whether at the time of the Agreement, the long term operation of the ethanol plan required Gateway's continued possession of the TO/Boiler; and (6) the economic benefit to Gateway and Dougherty [lessee] from the transaction being structured as a lease rather than a sale.[46]

The bankruptcy court concluded that the boiler's useful life was substantially longer than the lease and that it would have value if returned to the lessor at expiration. The total lease payments did not

---

[44] *Id.*

[45] 415 B.R. 486 (Bankr. D. Kan. 2009) (applying Illinois law due to presence of choice of law provision in the agreement).

[46] 415 B.R. at 505.

equal the initial full price of the boiler. Though the boiler was unique, it could be removed and refitted to another application. In short, the boiler would have meaningful economic life left at the end of the lease that made its lessor's reversion meaningful. Under the facts and circumstances of the case, the court found that a reversionary interest remained and the transaction was appropriately denominated a lease.

This Court has considered a TRAC lease of tractors in *In re Charles*.[47] That lease provided that, at the end of the lease term, the debtor could either acquire the tractors for the residual value plus a $500 fee or not acquire them. If the debtor chose the latter, the lessor was required to sell the tractors at auction to the highest bidder or re-let them. Either the sale proceeds or the present value of the re-letting rentals set the terminal value. If it was higher than the residual value, the debtor was paid the surplus; if lower, then the debtor made up the difference. The debtor could also hold the vehicles over and the lessor, at its option, could extend the lease on its terms for six additional months. This Court applied the provisions of the post-1987 version of § 1-201(37) (now § 1-203) to determine whether, under the terms of those agreements, the lessor retained some reversionary interest. Because these agreements were not subject to termination and featured a purchase option, the trustee alleged that they were disguised security agreements and sought to avoid the "liens" of the lessor. The trustee relied on *In re Zerkle Trucking Co.*[48] to contend that the rent adjustment provision at the end made the lessee's purchase price option essentially nominal, but the Court concluded that Kansas' enactment of the TRAC-neutral statute "hobbles the Trustee's argument that

---

[47] 278 B.R. 216 (Bankr. D. Kan. 2002).

[48] 132 B.R. 316 (Bankr. S.D. W.Va. 1991).

Case 09-05258   Doc# 58   Filed 09/03/10   Page 20 of 28

TRAC leases are . . . by definition sales or security transactions."[49]  The TRAC provisions merely

adjust the value of the lease property at the end of the term.  The lessee –

> "pays" the Residual Value only in the sense that he returns the vehicle (and pays any
> shortfall between the realized value of the vehicle and the Residual Value). Were this
> the badge of a disguised sale, nearly every lease would be subject to the Trustee's
> attack. Rather than creating an arrangement which effectively forces the lessee to
> purchase, the TRAC provision instead provides valuable incentive to the lessee to
> maintain the vehicle so that, upon its return to the lessor, he will not be obligated for
> any Residual Value shortfall.[50]

In *Charles,* this Court declined to follow previous Tenth Circuit authority because it was based on

the prior version of § 1-201(37) and instead held that the lessor maintained a significant reversionary

interest in the vehicles while the debtor retained no equity in them.[51]

Some courts take the opposite view and hold that since a TRAC lessor is protected from risk

of loss by the adjustment clause, it retains no down-side risk and therefore has lost its

entrepreneurial interest.  Others directly addressing TRAC features have held that because the lessor

sells the property at the end, it retains no meaningful reversionary interest in it.  Two such cases are

*Zerkle Trucking Co.* and *In re Grubbs Constr. Co.*,[52] both of which HPS relies upon extensively

here.

In *Zerkle*,[53] the debtor entered into a series of leases that contained a TRAC feature and

delegated to the debtor many of the burdens of ownership enumerated in § 1-203(c).  The TRAC

---

[49] *Charles*, 278 B.R. at 223.

[50] *Id.*

[51] *Id.* at 224 discussing *In re Tulsa Port Warehouse, Inc.*, 690 F.2d 809 (10th Cir. 1982).

[52] 319 B.R. 698 (Bankr.  M.D. Fla.  2005).

[53] 132 B.R. 316.

21

provision provided that at term's end, debtor would return the trucks to the lessor and either pay additional rent if the sale of the trucks brought less than the previously-agreed 20 per cent residual value or receive a rebate if the sales brought more. Zerkle was permitted, but not required, to purchase the vehicles at the sales. The court analyzed these transactions under the pre-1987 version of U.C.C. § 1-201(37) as well as the revised version that is identical to § 1-203. The bankruptcy court concluded that, as a practical matter, Zerkle had the right to become the owner of the vehicles for no more consideration than it was obligated to pay at the outset of the lease and, therefore, the leases were intended for security as a matter of law. The court also held that sale of the vehicles to a third party was "in the nature of a sale by Zerkle" because Zerkle was effectively required to guarantee the outcome by paying any shortfall between the residual value and the sale proceeds. Addressing the meaningful reversionary interest issue, the court commented that the fact that all risk of loss as well as anticipated benefit emanating from market factors had the effect of Zerkle obtaining an equity in the vehicle.[54] Thus, Zerkle, not the lessor, retained the meaningful reversionary interest, rendering the lease as one taken for security.

In *Grubbs*, the court considered an equipment lease with a TRAC clause somewhat different from that before us today. There, the debtor agreed to repay the lessor what the bankruptcy court characterized as a "balloon payment" equal to 20 per cent of the initial purchase price of the goods. The source of this payment was the sale, by the lessor, of the property at auction and the application of the net sale proceeds to the balloon. If the sale brought more than the balloon, the debtor received the surplus, but if the sale proceeds were short, the debtor was required to pay the balance. Under

---

[54] *Id.* at 321-22.

this agreement, the debtor had the right, but not the obligation, to bid. The opinion is silent as to the remaining economic life of the property. The judge compared this arrangement to a "typical installment loan" with a balloon payment in lieu of a down payment. He noted that in a typical installment arrangement, the borrower finances the acquisition of equipment with a loan that is repaid over a set term. If there is a balloon payment, the borrower can sell the equipment to pay it. The lender in such an arrangement has "no expectation or right to retain ownership of the 'collateral' at the conclusion of the loan period."[55] The court then concluded that in these circumstances a "lessor" reserves no meaningful interest in the property as a matter of economic reality. The court further determined that TRAC clauses recognize that the *lessee* retains an equity in the leased property because the lessee, and not the lessor, bears any loss arising from the terminal sale of the property.[56]

The only Tenth Circuit case directly addressing a TRAC clause is *In re Tulsa Port Warehouse, Inc.*[57] There, the debtor entered into four automobile leases that were assigned to General Motors Acceptance Corporation. The parties agreed to residual values at the end of the lease and deducted this amount from the vehicles' initial value. The total monthly rentals were that remainder, divided by the number of months in the lease to yield the monthly payment. Under one form of the lease, the vehicle was to be returned to GMAC at the conclusion of the rental period and sold. If the net sales proceeds exceeded the residual value, the lessee received the surplus; if not,

---

[55] 319 B.R. at 708.

[56] 319 B.R. at 718-19, citing *In re Tillery*, 571 F.2d 1361, 1365 (5th Cir. 1978).

[57] 690 F.2d 809, 811 (10th Cir. 1982).

Case 09-05258    Doc# 58    Filed 09/03/10    Page 23 of 28

the lessee paid lessor the difference, a classic TRAC clause.  Applying the former version of UCC § 1-201(37), the Tenth Circuit relied on earlier precedent to conclude that a lease without a purchase option could still be intended as security "if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot."[58]  Then the court reviewed the same laundry list of factors that is now found in § 1-203(c) with respect to the respective parties' duties to insure, pay sales tax, pay all other taxes, indemnification, or assumption of the risk of loss.  Then, agreeing with *In re Tillery*, the court concluded that "[t]he termination formula recognizes the equity of the 'Lessee,' in the vehicle because he is required to bear the loss or receive the gain from its wholesale disposition."[59]  It is important to remember here that *Tulsa Port Warehouse* was decided under the pre-1987 version of § 1-201(37) where intent of the parties, not economic realities, was the focus.  There was no TRAC-neutral statute like those enacted in both Texas and Kansas to color the court's analysis.[60]

This Court concludes that GECC retained a meaningful reversionary interest in the tractors and trailers.  The Court respectfully disagrees with *Zerkle* and *Grubbs* and holds that the lessee's duties to hold the lessor harmless from any depreciation in addition to the agreed residual price does not make these transactions more like a loan than a lease.  In particular, the Court questions those courts' assumptions that (1) the lessor's sale is the "equivalent" of the debtor's purchase of the

---

[58]  *Id.* at 811, quoting *Steele v. Gebetsberger (In re Fashion Optical, Ltd.),* 653 F.2d 1385, 1389 (10th Cir. 1981).  Former § 1-201(37) read in part, "whether a lease is *intended as security* is to be determined by the facts of each case."  (Emphasis added).

[59]  *Id.* at 811, quoting *In re Tillery*, 571 F.2d 1361, 1365 (5th Cir. 1978).

[60]  *See* TEX. TRANSP. CODE ANN. § 501.112 (West 2009); KAN. STAT. ANN. § 84-2a-110(a) (2009 Supp.) (enacted in 1998).

property at a nominal price; and (2) that the lessor's sale strips it of a reversionary interest in the goods sold. First, while HPS might have the right to bid at GECC's sale, it is likely that HPS would have to bid the residual amount to acquire the goods. That amount is not "nominal." Unless HPS purchases these vehicles at the end of the lease term, it will retain no interest in them. Second, while GECC may no longer have the property after the sale, it will retain the proceeds of the property which is its economic equivalent. It is therefore difficult for this Court to see how GECC "loses" its reversionary interest in the property when it keeps the proceeds. Further, while HPS is bound to make up any shortfall between the sale proceeds and the residual value, GECC has the credit risk that HPS may not be in a position to pay that shortfall at termination. HPS' obligation to make up the shortfall also creates an incentive for it to use and maintain the leased goods in a way that protects it from paying the shortfall at the end. As Minan and Lawrence point out, a TRAC provision "is simply a more sophisticated means to measure the true extent to which the lessee has consumed the lessor's interest in the goods."[61] Terminal rent adjustment effectively prices use over and above that which the parties contemplate at the outset of the transaction. So long as the retained reversionary interest is substantial, the presence of a TRAC clause does not change the economic reality of the transaction. The economic reality here is that these Agreements are leases.

Comparing these Agreements to the agreement in *Grubbs* shows the fundamental difference between GECC's documents and a loan transaction. The presence of a balloon payment purchase provision in the *Grubbs* case makes the loan analogy more apt there than it would be here. As the *Grubbs* court pointed out, that payment is analogous to a down payment, except that it is paid at the

---

[61] THE LAW OF PERSONAL PROPERTY LEASING, § 2:26, p. 4, citing *In re Otasco, Inc.*, 196 B.R. 554 (N.D. Okla. 1991).

end of the relationship.[62] In *Grubbs*, the presence of a purchase option suggests that both parties had some expectation that the lessee would wind up with the goods in the end. In a loan transaction, the lender primarily expects to receive repayment of its principal and interest The only expectation a lender has concerning its collateral is secondary: the lender hopes that the collateral will be worth the balance of the note in the event the borrower's default requires the lender to foreclose and realize the benefit of the collateral. In every other respect, the borrower retains every incident of ownership as well as a duty to pay for that ownership. When the loan is paid, the borrower is entitled to a release of the lender's lien on property that he has owned all along. Only if the borrower defaults will the lender have any possessory interest in the collateral. Contrast that model with a lessee being obligated to pay for the use of property that, at lease's end, has an agreed residual value. Even where the lessor's interest in the residual value is protected by a rent adjustment clause, the lessor still retains a residual interest throughout the transaction's term. Here, where there is no balloon payment option, the Court may easily conclude that these Agreements are leases.

Texas law supports this view. As noted above, Texas has enacted a TRAC-neutral statute, but that alone should not drive this analysis. In *Excel Auto and Truck Leasing, L.L.P. v. Alief Independent School Dist.*, the Texas Court of Appeals applied § 1-203 to hold that the inability of the lessee to terminate before the end of the lease term is still an indispensable requirement to finding the presence of a security interest.[63] The agreements there contained provisions permitting the lessee to terminate the agreements at any time. The Texas court then analyzed the TRAC

---

[62] 319 B.R. at 707-08.

[63] 249 S.W.3d 46 (Tex.App-Houston, 2007).

Case 09-05258   Doc# 58   Filed 09/03/10   Page 26 of 28

provision as well as the other risk-shifting provisions contained in that lease by comparing them to the § 1-203(c) conditions and concluded that the presence of some of those conditions was not controlling and the agreements did not meet the two-part test for the existence of a security interest.[64]

Conclusion

The Court does not reach this conclusion without recognizing the significant effect it will have on this reorganization. A substantial portion of the HPS fleet is leased under these Agreements and this Court's determination that they are true leases will compel HPS either to cure and assume these leases or to reject them under § 365. HPS contends that TRAC leases and TRAC-neutral statutes are designed solely to force debtors into § 365 and deprive them of substantial rights under the cramdown provisions and that this result would be inequitable. Appeals to "equity" in the context of this legal issue may be facially attractive, but they have no basis in the Bankruptcy Code. While other sections of the Code specifically authorize the court to consider the equities of a situation in making a decision, nothing in § 365 suggests an "equitable" approach to resolving the lease/financing question.[65] The Court cannot view these transactions in a bankruptcy-induced vacuum when their essential legal nature must be determined by applicable state commercial law. In the absence of any compelling similarity to secured transactions, these Agreements must be declared to be the true leases that they are.

Accordingly, the Court concludes that GECC is entitled to judgment as a matter of law that the Agreements are leases that are subject to treatment under § 365 and not to cram-down under §

---

[64] 249 S.W.3d at 53-54.

[65] *See*, e.g., § 552(b)(1), allowing the court to sever a security interest in proceeds or products of pre-petition collateral "based on the equities of the case."

27

1129(b).  GECC's motion for summary judgment is granted; HPS motion for summary judgment is denied.  A Judgment on Decision will enter this day.

# # #